# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 2907 | **DATE** | 5/10/2001 |
| **CASE TITLE** | Mary A. vs. Harrison | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 5/24/01 at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion for summary judgment (Doc. No. 43-1) is granted as to Counts I and II of Plaintiffs' Complaint and denied as to Count III. Plaintiffs' motion to strike (Doc. Nos. 45-1, -2, -3, 4, -5, -6) is denied in whole. Additionally, Plaintiffs' motion to amend their complaint (Doc. No. 44-1) is granted in part and denied in part. Officers Lewandowski, Weiglein and Detective DiSantis are hereby dismissed from this case, while Officers Moore and Wirack, along with Deputy Superintendent Harrison remain as Defendants.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 1 1 200 | 51 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 5/10/2001 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARY A, a minor, by her next friend, MARY HADAC, and MARGARET M., a minor, by her next friend, RITA CHAVEZ, <br><br> Plaintiffs, <br><br> v. <br><br> BERNARD HARRISON, OFFICER LEWANDOWSKI, Star No. 211, OFFICER MATT WEIGLEIN, Start No. 279, DETECTIVE DISANTIS, DETECTIVE ROSE MOORE and OFFICER WALTER WIRACK, <br><br> Defendants. | No. 99 C 2907 <br><br> Judge <br> Rebecca R. Pallmeyer |



## MEMORANDUM OPINION AND ORDER

This civil rights action was brought by two young girls and their mothers, protesting the treatment the minors received when they were arrested on charges of misdemeanor theft. Plaintiffs, Mary A. and Margaret M., through their mothers Mary Hadac and Rita Chavez, brought this §1983 action claiming that they were falsely arrested and, once arrested, subjected to unreasonable searches and police brutality by various Cicero police officers ("Defendants").[1] Defendants now move for summary judgment. Defendants contend that they had probable cause to arrest Plaintiffs and that Plaintiffs were subjected only to a reasonable patdown search of their persons and were not otherwise touched by any officer.

---

[1] Specifically, Plaintiffs have named six Cicero Police officers and Detectives in this action, including: Deputy Superintendent Bernard Harrison, Officer Mark Lewandowski, Officer Matthew Weiglein, Detective James Disantis, Officer Rose Moore and Officer Walter Wirack.

reasonable patdown search of their persons and were not otherwise touched by any officer. Defendants also contend that, to the extent any claim states a constitutional violation, they are entitled to qualified immunity. At the same time, Plaintiffs have moved to strike various affidavits and deposition testimony relied upon by Defendants for their motion. For the following reasons, Plaintiffs' motion to strike is denied and Defendants' motion for summary judgment is denied in part and granted in part.

## FACTUAL BACKGROUND

### A.    Events Leading up to Plaintiffs' Arrest

On April 30, 1998, at approximately 3:30 p.m., Mary A. and Margaret M. (collectively "Plaintiffs"),[2] both 13 years of age at the time, were walking near Hawthorne Park in Cicero, Illinois. (Cicero Defendants' Rule 56.1 Statement of Material Facts in Support of Their Motion for Summary Judgment (hereinafter "Defs.' 56.1 Statement") ¶ 1; Plaintiffs' Additional Statement of Facts (hereinafter "Pls.' 56. 1 Additional Facts") ¶ 1.) At the same time, Evelyn Pogvara, age 15, was riding her bike near Hawthorne Park towards the two girls. (Defs.' 56.1 Statement of Facts ¶ 2.) A few days earlier, Evelyn had gotten into a fight with Mary A.'s younger sister. (Mary A. Dep., at 14.) For this reason, after Evelyn rode her bike near Plaintiffs, she and Mary A. exchanged harsh words. (*Id.* at 22; Margaret M. Dep., at 30.) Both Plaintiffs then pushed Evelyn off the bike. (Mary A. Dep., at 22; Margaret M.

---

[2]    Though Mary A.'s mother, Mary Hadac, and Margaret M.'s mother, Rita Chavez, are also named plaintiffs in this suit, for clarity sake, "Plaintiffs" will refer only to Mary A. and Margaret M.

Dep., at 30.) After Evelyn was pushed off the bike, she walked "pretty fast" away from the scene. (Mary A. Dep., at 24.) Mary A. grabbed Evelyn's bike and threw it a short distance to the corner, approximately "a car space . . . away" from where they were standing. (Margaret M. Dep., at 30-31.) Both girls then ran to Mary A.'s home, leaving the bike on the corner. (*Id.*)

Approximately one hour later, Evelyn Pogvara went to Mary A.'s home accompanied by her mother and grandmother. (Defs.' 56.1 Statement ¶ 6.) Mary A.'s mother, Mary Hadac, answered the door and an argument ensued among the three adults that resulted in Hadac's calling the Cicero police. (*Id.* ¶ 6; Hadac Dep., at 20.) Defendant Cicero police officers Mark Lewandowski and Matt Weiglein responded to Hadac's call, but by the time they arrived, the Pogvaras had left, so the two officers took no action. (Defs.' 56.1 Statement ¶ 7.) The officers told Hadac that if they heard anything from the Pogvaras, they would call Hadac and have her bring the girls to the station. (Hadac Dep., at 25.)

Later that same day, around 5:00 p.m., the Cicero police called Mary Hadac and requested that she bring Mary A. and Margaret M. to the police station to discuss the bike incident. (*Id.*; Def.'s 56.1 Statement ¶ 8.) When Hadac arrived with the two girls at the police station at about 6:00 p.m., Evelyn Pogvara, her mother, and her grandmother were also at the police station. (Defs.' 56.1 Statement ¶ 8.) Once there, Plaintiffs, Mary Hadac, and the Pogvaras all sat together in the squad room while Officer Lewandowski and Officer Weiglein asked them questions about the incident that had occurred earlier that day. (*Id.* ¶ 9; Hadac Dep., at 28-29.) A loud argument soon ensued among Hadac and Pogvara's mother and

grandmother. (Defs.' 56.1 Statement ¶ 9; Hadac Dep., at 30.)

After hearing the loud yelling in the squad room between the Pogvaras and Hadac, Deputy Superintendent Bernard Harrison became concerned that the yelling could escalate and become a "safety issue within the stationhouse," and, therefore, together with Detective James DiSantis, came into the squad room to find out from Lewandowski what was happening. (Harrison Aff. ¶ 5.) At this time, either DiSantis or Harrison told Lewandowski to complete a General Report Form ("GRF"), an investigative report, concerning the incident. (Lewandowski Dep., at 60.)

Officer Lewandowski then interviewed each side separately and completed a GRF. (Defs.' 56.1 Statement ¶ 9.) Officer Lewandowski testified that when he interviewed both groups separately, Evelyn Pogvara told him that Plaintiffs had knocked her off her bike and threatened her, and then she ran away. (Lewandowski Dep., at 75.) Later, in an affidavit attached to Defendants' motion for summary judgment, Officer Lewandowski added that Evelyn told him directly that Plaintiffs had "stolen the bike." (Lewandowski Aff. ¶ 6.) Mary A. admitted to Officer Lewandowski that she and Margaret knocked Evelyn off her bike because they thought Evelyn intended to hit them with the bike. (*Id.*; Plaintiffs' Response to Defendants' Rule 56.1 Statement of Material Facts (hereinafter "Pls.' 56.1 Response") ¶ 11.)

In addition, Lewandowski's General Report, in relevant part, stated:

Donna [Pogvara, Evelyn's mother] states that her daughter, Evelyn, came home and stated that two female juveniles had stolen her bicycle . . . .

Evelyn stated that both suspects #1 [Mary A.] and #2 [Margaret M.] had knocked her off her bicycle and threatened to 'kick her ass.' Evelyn then ran

4

away leaving her bicycle on the ground in front of [Mary A.] and [Margaret M.] Evelyn went back to try and get her bike, but it was missing.

Suspect #1 [Mary A.] Statement:
Mary states that she did knock Evelyn off of her bike because Evelyn was going to run over Mary [and] Margaret. After Mary knocked Evelyn off the bike, Evelyn ran away, leaving her bike. Mary then walked away with Margaret leaving the bike.

(General Report Form and Supplement Report Form, Exhibit #2, Weiglein Dep.)

## B.    Plaintiffs' Arrest

Lewandowski gave the GRF to Deputy Superintendent Harrison and Detective DiSantis. (Lewandowski Dep., at 77.) Harrison instructed Lewandowski to complete a "slow juvenile petition" charging the Plaintiffs with misdemeanor theft. (Defs.' 56.1 St. ¶ 14; Lewandowski Dep., at 78.) A "slow juvenile petition" is a form of complaint against juveniles signed by the guardian of the victim. (Lewandowski Dep., at 78.) Because juveniles may not be charged as adults, the slow petition is, in Officer Lewandowski's words, "basically . . . a petition to petition the Juvenile [C]ourt to bring this matter into the court." (*Id.* at 79.) According to Lewandowski, that form meant the Plaintiffs were being charged with misdemeanor theft. (Lewandowski Dep., at 79; Lewandowski Aff. ¶ 8.) Both Evelyn and her mother, Donna, signed the "Petition for Adjudication of Wardship" against Mary A., stating that she "committed the offense of theft" when "she knowingly obtained unauthorized control over property of Evelyn [Pogvara], one huffy 18 red bicycle having a total value not exceeding $300.00, intending to deprive Evelyn . . . permanently [of] the use of [her] property." (Exhibit A, Lewandowski Aff.) Defendants claim that such a complaint was also

5

signed against Margaret M., but there is no Petition for Adjudication of Wardship against Margaret found in the record.

Deputy Superintendent Harrison testified that, at that time, he believed there was probable cause to arrest both Mary A. and Margaret M. (Harrison Aff. ¶ 7.) As Harrison explained, he based the theft charge on the fact that "they knocked the girl off the bicycle and the bicycle was left in their presence and later disappeared." (Harrison Dep., at 62.) After the petition was completed, therefore, Harrison told Plaintiffs that they were under arrest and would be fingerprinted and photographed. (*Id.* ¶ 16.) Mary Hadac became upset and started yelling at the police officers, saying "No, no, no, no, no. You ain't fingerprinting and mug shotting [sic] these girls. They are only 13 years old . . . .[i]t ain't going to be done." (Hadac Dep., at 38.) Hadac also told the girls not to stand up. (Defs.' 56.1 Statement ¶ 22; Pls.' 56.1 Response ¶ 18.)[3] Harrison then told the girls to stand up and they did so. (*Id.* at 52; Defs.' 56.1 Statement ¶ 18.) It is at this point that the police and Plaintiffs' accounts of the events diverge.

Hadac testified that once Harrison told the girls to put their hands behind their backs, they promptly complied. (Hadac Dep., at 52.) According to Mary A. herself, however, Hadac started screaming and, at that time, the officers "put our hands behind our back, didn't

---

[3]     In her deposition, Hadac testified that she did not tell the girls not to stand up (Hadac Dep., at 52), but Plaintiffs' 56.1 Response admitted this fact as true. As noted, Hadac herself admits she yelled at the police officers that they must not photograph the girls or take fingerprints, and both Mary A. and Margaret M. testified that Hadac screamed and yelled at the officers. Regardless of the propriety of the officers' actions, Ms. Hadac's conduct in encouraging young girls to resist law enforcement officers is disappointing and unwise.

handcuff us, and our hair was pulled." (Mary A. Dep., at 59.)[4] Though Margaret M. does not

say whether or not she cooperated with the police, Mary A. admits that she herself refused

to go in the lockup room, and just stood there, so in order to get her into the lockup, about

8 feet away, the officers had to push her from the back until she eventually started walking

under her own power. (*Id.* at 64.) She claims that the way the officers gripped her wrists

hurt her hands, but she acknowledges that she did not say anything like "ouch" or complain

about the pain. (*Id.* at 61.)

According to Margaret M., the policemen grabbed her by her arms and made her walk

by pushing her in the direction of the lockup. (Margaret M. Dep., at 68-69.) She was not sure

how many policemen grabbed her. (*Id.* at 68.) As she explained, "they were just grabbing us

real hard, and then they just pushed us to go to the lockup room." (*Id.* at 69.) Margaret did

not testify that they grabbed her hair at all, just her hands. (*Id.* at 69.) At that time she heard

Mary Hadac yelling loudly. (*Id.* at 69.) According to Margaret, when the police grabbed her

hands it hurt like a pinch with "a long sting" because they didn't let go until the girls reached

the lockup cell. (*Id.* at 71.) According to Hadac, Harrison and DiSantis were the ones who

grabbed the girls, while Officers Lewandowski and Weiglein stood by. (Pls.' 56.1 Response

¶ 22; Pls.' 56.1 Additional Facts ¶ 3.)

According to Deputy Superintendent Harrison, once he told the girls that they were

under arrest, Hadac not only screamed at the police, but she also instructed the girls not to

---

[4]     Mary A. explained that her hair was down to the middle of her back and she
wore it "in a ponytail and down." (Mary A. Dep., at 59.)

cooperate with the police. (Harrison Aff. ¶ 8.) Hadac also told the girls to refuse to stand up. (Defs.' 56.1 Statement ¶ 18; Pls.' 56.1 Response ¶ 18.) According to Defendants, Lewandowski and Harrison then escorted Plaintiffs to the lockup to be fingerprinted and photographed. (Defs.' 56.1 Statement ¶ 22.) Harrison testified that he never grabbed anybody by the hair, did not touch either of the Plaintiffs at any time, and did not see any other member of the Cicero Police Department touch either girl. (Harrison Aff. ¶ 13; Harrison Dep., at 77.) Similarly, Officer Lewandowski testified that he never saw Deputy Superintendent Harrison or any other member of the Cicero Police Department touch Mary A. or Margaret M. (Lewandowski Aff. ¶¶ 12, 14.) It is undisputed that Lewandowski and Weiglein did not touch either Plaintiff at that time. (Hadac Dep., at 55; Lewandowski ¶ 13.) It is also undisputed that neither Plaintiff sustained any physical injuries on the way to the lockup. (Mary A. Dep., at 101; Margaret M. Dep., at 107.)

**C.    Search of the Plaintiffs**

On the way to the lockup, Harrison spotted Detective Rosemary Moore. (Defs.' 56.1 Statement ¶ 24.) He asked her to accompany the Plaintiffs to the lockup room to perform a patdown search, pursuant to the Cicero police General Order No. 17. (*Id.*) That order states, in relevant part:

> Prisoners brought into the station that are placed in the holding cell, will be processed like any other prisoner prior to placement in the holding cell, regardless of the duration of their stay. No prisoner will be placed in any cell, juvenile, holding or otherwise will [sic] any property regardless of the reason. Once in the station as a prisoner, the first order of business is the search and inventory of property in his/her person.

(General Order No. 17, Lock-Up Procedures, Exhibit B, Harrison Aff.) Again, Plaintiffs' account of the search diverges from that of the police and Plaintiffs themselves do not agree entirely with each other's account of what occurred.

According to Mary A., Officer Moore stood behind her and:

> First she [Moore] patted me down and then she asked me if I had anything in my bra or anything and I told her no. So she had lifted up my shirt up to my bra; and then she, like, started searching my bra to see if I had anything. Then she unbuttoned my pants and looked to see if I had anything in there too.

(Mary A. Dep., at 77-78.) In addition, Mary A. explained that the officer tapped her "legs and my arms and my waist and everything." (*Id.* at 78.) She also said that the officer put her hands on her bra and her breast and didn't pull the bra to look inside but she "put her hand in there just to feel underneath and everything." (*Id.* at 79.) She claims that while she was being searched she could see a male prisoner and that "[h]e could see, like, the whole side of us." (*Id.* at 81.) She also says that he was looking at her and saying "sick" things to them about how nice they looked. (*Id.*)

She admits that the officer never told her to take her clothes off but claims that when the officer unbuttoned her pants her underwear "kind of showed." (*Id.* at 80.) She also admits that her bra was exposed as she struggled with Officer Moore during the patdown search. (Defs.' 56.1 Statement ¶ 39; Pls.' 56.1 Response ¶ 39.)

Mary A. recalls that during the time she was being searched by Officer Moore, Margaret M. was being searched by a male officer who "was not doing the same thing [as Moore was to her], but he had her pants unbuttoned searching her." (Mary A. Dep., at 80.)

According to Mary A., Moore never searched Margaret. (*Id.* at 83.) Margaret M. completely contradicts Mary A.'s story, however, and testified that she was searched only by Officer Moore and never by a male officer. (Margaret M. Dep., at 93.)

According to Margaret M., Moore searched Mary first. (*Id.* at 76, 89.) She testified that she observed Mary A. being patted down the pant legs and that Moore lifted Mary A.'s shirt slightly from behind exposing "just the cup of her bra." (*Id.* at 89-90.) Moore then searched Margaret and "unbuckled my pants and put them down a little bit" exposing her underwear a little bit. (*Id.* at 93.) She could not remember if Moore patted her down first before unbuckling her pants. (*Id.* at 93.) Margaret admits that while Moore did this she "tried to move away." (*Id.* at 93.) She admits, further, that her shirt was not raised at any time. (*Id.* at 96.) According to Margaret, the only person who was in the room with them besides Moore was "the bookkeeper," Officer Walter Wirack. (*Id.* at 90.) She also stated that "behind me I seen [sic] the officers looking through the window, through the little window they have in the door" while Mary A.'s shirt was pulled up. (*Id.* at 90.) Then the bookkeeper took Plaintiffs' fingerprints and mug shots. (*Id.* at 96.)

While the girls were being searched, Harrison allowed Hadac to walk to the door of the lockup area to tell Plaintiffs to cooperate with the booking procedure. (Hadac Dep., at 58.) Hadac agreed to do this at this time because she wanted to get the girls back home and out of the lockup as soon as she could. (*Id.*) When she walked to the door, Hadac alleges that she saw the female officer in the lockup and, though she did not see any other prisoners, she heard a male voice yelling out "some stuff." (*Id.* at 60.) She also says she saw Mary A. with

her shirt up and her bra showing. (*Id.* at 60-61.) Hadac also testified that she observed that Mary A.'s pants were unbuttoned and pulled down slightly, but she did not see Mary A.'s underwear. (*Id.* at 61.) Finally, with respect to Margaret M., Hadac claims that she had her pants unbuttoned and pulled down slightly, but Hadac could not see Margaret's underwear. (*Id.*)

Officer Moore herself testified that, once in the lockup room, she stood behind the girls and performed a patdown search. She claims she did not, at anytime, "touch the skin or underwear" of either girl, nor did she observe either girls' underwear. (Moore Aff. ¶¶ 8-11.)[5] She also testified that she did not observe Officer Wirack touch Mary A. or Margaret M. at any time. (*Id.* ¶ 12.) Harrison also testified that he observed Moore conduct the patdown because he stood with the door open approximately a foot and a half. (Harrison Dep., at 82.) He says the patdown took less than five minutes. (*Id.* at 83.)

The Defendant officers also assert that there were no prisoners in the lockup room and no prisoners in the lockup cells at the time that Plaintiffs were brought into the lockup. (Defs.' 56.1 Statement ¶ 26.) Defendants point out that they have a standing rule that "[a]t all times there shall be complete segregation of male and female prisoners to assure adequate privacy." (General Order No. 17 ¶ 3, Exhibit B, Harrison Aff.) Officer Wirack, who is responsible for recording the names of all individuals held in the lockup, testified that "[a]t

---

[5]     Cicero Police Department General Orders include the definition of a strip search as "having an arrested person remove or arrange some . . . of his or her clothing as to permit a visual inspection of the . . . undergarments of such person." (Pls.' 56.1 Response ¶ 28.)

the time when Mary A. and Margaret M. were in the lockup room, there were no other individuals being held in the lockup . . . [and there] are no records showing that any individual was being held in the lockup on April 30, 1998 at the time when Mary A. and Margaret M. were in the lockup area." (Wirack Aff. ¶ 6.)[6]   According to Moore, the only other individual present during the patdown search besides Moore and Plaintiffs was the lockup officer, Walter Wirack. (Moore Dep., at 39.)  Additionally, Moore and Wirack testified that it is physically impossible to look from a cell in the lockup cells into the lockup room where Mary A. and Margaret M. were standing on April 30, 1998. (Moore Aff. ¶ 6; Wirack Aff. ¶ 7.)

All parties agree that, once in the lockup room, Moore did not, at any time, order the Plaintiffs to remove, unfasten, or rearrange any clothing. (Mary A. Dep., at 80; Moore Aff. ¶ 9.)  Additionally, all parties agree that neither Plaintiff suffered any physical injury as a result of the search, nor has either sought any help from a doctor or a psychologist as a result of their detention. (Mary A. Dep., at 101; Margaret M. Dep., at 107, 109; Hadac Dep., at 91-92.)  After the patdown search, Officer Wirack fingerprinted and photographed Plaintiffs, processed the girls and released them to Hadac. (Defs.' 56.1 Statement ¶ 31.)[7]

---

[6]     On March 22, 2001, this court granted Plaintiffs' unopposed motion for leave to substitute Officer Walter Wirack for Officer Bruno Swiatek as a party Defendant (Doc. No. 48) after it became clear during discovery that Officer Wirack, not Officer Swiatek, was the bookkeeper for the lockup on the evening of April 30, 1998.

[7]     Plaintiffs allege that the general orders of the Cicero Police Department allow the fingerprinting of juveniles only in felonies and serious misdemeanors. (Pls.' 56.1 Response ¶ 31; Exhibit H.)

<u>**DISCUSSION**</u>

**A.      Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether any genuine issues of material facts exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Thomas & Betts Corp.*, 138 F.3d at 291; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In ruling on a motion for summary judgment, the court cannot weigh the affidavits or the credibility of the parties. *See Castillo v. United States*, 34 F.3d 443, 445 (7th Cir. 1994); *Dorden v. Acevedo*, No. 99 C 4381, 2000 WL 1222193, at *2 (N.D. Ill. 2000). Nevertheless, contradictory and unsupported assertions of fact are insufficient to defeat summary judgment. *See, e.g., Ilbardt v. Sara Lee Corp.*, 118 F.3d 1151, 1152 n. 1 (7th Cir. 1997). "Factual disputes are 'material' only when they 'might affect the outcome of the suit under governing law.'" *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 610 (7th Cir. 2001)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *Thomas & Betts Corp.*, 138 F.3d at 291.

**B.      Plaintiffs' Motion to Strike**

As an initial matter, Plaintiffs have moved to strike certain affidavits and deposition

testimony that Defendants rely on for their summary judgment motion, including: (1) the affidavits of Deputy Superintendent Harrison, Officer Lewandowski, Officer Moore, and Officer Wirack; (2) deposition testimony of Officer Lewandowski and Officer Wirack; and (3) the Petition for Adjudication of Wardship signed against Mary A. The court will address each of Plaintiffs' objections in turn.

To begin with, Plaintiffs argue that the affidavits of Harrison, Lewandowski, Moore and Wirack are not "based on the personal knowledge of the various affiants" and, additionally, that "none of them show the requisite competency of the various affiants to testify." After reading each affidavit, the court does not understand, nor do Plaintiffs bother explaining, what particular information Plaintiffs believe to be outside of the affiants' personal knowledge. Indeed, the court finds that each affidavit merely recounts the officers' version of the events. Thus, Plaintiffs' blanket assertion that these basic facts -- such as what the officer observed during the Plaintiffs' detention and search -- are not based on the officers' "personal knowledge," defies logic. In addition, though several of the affidavits do not specifically say that the affiant is competent to give such testimony, Plaintiffs do not submit any evidence to even suggest that any of the officers are not competent to testify. Again, this argument can only be seen as frivolous. [8]

Plaintiffs next complain that the deposition transcripts of both Defendants Harrison

---

[8]     Additionally, Plaintiffs had moved to strike the affidavit of Officer Lewandowski because it was unsigned, but Defendants have since cured this defect and presented Plaintiffs and this court with a signed copy of the affidavit.

and Lewandowski do not "on their face establish that they were made under oath." Wisely, Plaintiffs later say that this is a minor "quibble" that they will withdraw -- especially in light of the fact that they took these depositions! Plaintiffs also ask to strike the Wirack transcript because it was not attached to Defendants' 56.1 Statement of Facts. Because, as Defendants point out, Plaintiffs actually took this deposition, as well, and because Defendants have since provided Plaintiffs with this transcript, this argument, too, is meritless.

Finally, Plaintiffs move to strike the Petition for Adjudication of Wardship signed by Evelyn Pogvara and her mother, contending that it was not made on the personal knowledge of the signator and, additionally, that it constitutes inadmissible hearsay. After reviewing the petition, however, the court finds that the information was, in fact, based on Evelyn's version of the events that occurred to her on April 30, 1998 and was signed by her mother only because Evelyn herself could not sign it as a minor.

Nor is this petition impermissible hearsay. Plaintiffs are bringing a false arrest claim against the officers who arrested them and not any action against the Pogvaras. The relevant question for this court, therefore, is simply what the Defendant officers knew when they determined that there was probable cause to arrest Plaintiffs and not whether Evelyn Pogvara actually told the police the truth or, even, whether Plaintiffs actually stole the bicycle. *See, e.g., Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998) (when determining whether police had probable cause to arrest, the analysis depends not on whether or not the witness was correct in the facts she reported to the police, but, instead, on "what the police know, not whether they know the truth"). Because these statements are clearly not being offered for the truth

of the matter asserted, but, rather, to show the effect that the statements had on the officers, they are not hearsay and are admissible. *See, e.g. Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000)(statements in an arrest report and criminal complaint, offered to defeat a false arrest claim, are not offered for the truth of the matter asserted, and are therefore admissible).

## C.     Plaintiffs' False Arrest Claim

The first count of Plaintiffs' complaint alleges that Defendants subjected them to an unlawful arrest. Because the constitutionality of a warrantless arrest for a criminal offense turns on whether or not the arresting officer had probable cause to make the arrest, an "essential predicate to any §1983 claim for unlawful arrest is the absence of probable cause." *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998)(citing *Jones by Jones v. Webb*, 45 F.3d 178, 181 (7th Cir. 1995)). Contrary to what its name might seem to suggest, probable cause "demands even less than 'probability.'" *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000). It "requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Id.* Courts evaluate probable cause "not on the facts as an omniscient observer would perceive them, but on the facts as they would have appeared to a reasonable person in the position of the arresting officer." *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992).

Applying this standard, the Seventh Circuit has repeatedly held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause. *See, e.g., Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 2000); *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998)(citing *Gramenos v. Jewel Co., Inc.*, 797 F.2d 432, 439 (7th Cir.

16

1986)(when "an officer has received his information from some person--normally the putative victim or an eyewitness--who it seems reasonable to believe is telling the truth, he has probable cause" to arrest the accused perpetrator). Moreover, this court has emphasized that "once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Eversole v. Steele*, 59 F.3d 710, 718 (7th Cir. 1995).[9]

Plaintiffs claim that, based on the facts known to the Defendant officers at the time of the arrest, no reasonable officer could have found probable cause to arrest them for misdemeanor theft. Specifically, they claim that because Evelyn admitted she "ran away" after Plaintiffs threw her from her bike, there was no basis at all for charging the Plaintiffs with theft.[10]

The court disagrees. In Illinois, a person commits theft "when he knowingly: (1) [o]btains or exerts unauthorized control over property of the owner; or . . . (3) [o]btains by threat control over property of the owner" either intending "to deprive the owner

---

[9]  Additionally, where, as here, the defendant has asserted the defense of qualified immunity, as long as a reasonably credible witness or victim informs the police that someone has committed a crime, the officers' actions will be "cloaked with qualified immunity" even if the arrestee is later found innocent. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 2000)(citing *Jenkins*, 147 F.3d at 585).

[10]  Amazingly, Hadac explains that Evelyn's decision to run away and leave the bike "in Cicero . . . could be the stupidest mistake to ever do" despite the fact that Mary A. and Margaret M. admitted that they threw Evelyn off the bike. (Hadac Dep., at 20.) Apparently, in order to ensure the safety of the bike, Hadac expected Evelyn to forego her own.

permanently of the use or benefit of the property," or "[u]ses, conceals, or abandons the property knowing such use, concealment or abandonment probably will deprive the owner permanently of such use or benefit." 720 ILCS 5/16-1. Officer Lewandowski testified that Evelyn Pogvara told him that Plaintiffs had thrown her from her bike, threatened to "kick her ass" and that, after she was thus threatened, she ran home. Further, Lewandowski's notes reflect that Evelyn told him she went back for her bike but it was no longer there. Lewandowski also testified that Evelyn told him that Plaintiffs had stolen her bicycle and Pogvara and her mother signed a Petition for Adjudication against Mary A. claiming that Mary A. "knowingly obtained unauthorized control over property of Evelyn [Pogvara]. . . intending to deprive Evelyn . . . permanently [of] the use of [her] property."[11] Finally, Plaintiffs admitted to Lewandowski that they had thrown Evelyn from her bike. Thus, it was possible for Officer Lewandowski to find that it was "more than a bare suspicion" that the girls had committed theft. *Woods*, 234 F.3d at 996. Indeed, it is easy to see how Evelyn may have believed that Plaintiffs intended to steal her bike when they knocked her off it and

---

[11] Plaintiffs make much of the fact that Officer Lewandowski did not specifically state in his deposition that Evelyn told him Plaintiffs had stolen her bicycle, but, instead, added this fact in an affidavit sworn to after his deposition. Plaintiffs claim that the affidavit, therefore, contradicts his prior testimony. The court cannot agree. As has already been explained, Lewandowski testified at his deposition that Evelyn told him she had been thrown from her bike, Plaintiffs admitted they threw her, and, finally, Evelyn told him her bike was missing when she went back to get it. The fact that he later related that she specifically said Plaintiffs stole her bike does not contradict anything in his deposition testimony. Further, because Evelyn signed the Petition for Adjudication of Wardship which stated that Mary A. had stolen her bicycle, Officer Lewandowski's affidavit did not provide new information; it was already clear that, at the very least, Evelyn believed Plaintiffs had stolen her bicycle.

threatened her until she abandoned the bike and ran home.

In a case strikingly similar to the one at hand, *Gerald M. v. Conneely*, 858 F.2d 378, 381-82 (7th Cir. 1988), the Seventh Circuit found that the defendant officer had probable cause to detain two juveniles for theft.[12] In *Gerald M.*, ten-year old Jay and eight-year old Mark Macek threw ten-year old Todd Urban off his bicycle, punched him in the face, and threw his bike over a fence into a backyard. *Id.* at 380. After the Urbans complained to the police that the Macek brothers had stolen Todd's bicycle, an officer came out to the Macek home, interviewed the boys, and eventually recovered the bicycle when the boys showed him where they had left it. *Id.* at 380. He then took the boys to the station where they stayed for under two hours until they were let go without being charged for any crime. *Id.* The Seventh Circuit found that the uncorroborated report of Todd Urban claiming that his bicycle had been stolen was sufficient as a matter of law to authorize the custodial arrest of the Maceks, thereby defeating any claim that the boys' constitutional rights were violated when they were taken into custody. *Id.* at 381. As the court explained, the victim's young age was not enough to make his story unworthy of belief. *Id.* Nor did the existence of animosity between the victim's and the plaintiffs' families make Urban's complaint inherently unreliable. *Id.* In addition, the court was clear that "the law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage, even

_____

[12]     Though the *Gerald M.* plaintiffs were only detained and not arrested for theft, the court nevertheless went through the same probable cause analysis as would be necessary for an unlawful arrest claim.

if ideally that might appear to be a more desirable approach." *Id.* (*citing Gramenos v. Jewel Cos.*, 797 F.2d 432, 441-42 (7th Cir. 1986)). Instead, the court found that "a prudent officer would believe that the facts and circumstances showed that there was probable cause to believe" a crime had been committed. *Gerald M.*, 858 F.2d at 382.

Similarly, in this case, there was no reason for Officer Lewandowski to doubt that Evelyn Pogvara was a competent witness. Nor did it matter that Evelyn had not seen the girls walk away with the bike. It was enough that she reported the facts as they occurred and that her bike was missing when she went back to retrieve it. Indeed, the officer in *Gerald M.* recovered the bike *before* he took the boys into detention, so the fact that the bike was not found in Plaintiffs' possession is of no moment. Thus, once Officer Lewandowski and the other officers involved in Plaintiffs' arrests were told by a competent witness that Plaintiffs had committed a crime, the officers had probable cause to arrest the girls. *See also Woods*, 234 F.3d at 997 (finding it was irrelevant to the probable cause inquiry that there was no evidence that corroborated the victim's complaint; victim's complaint was sufficient and defendant officer did not have constitutional duty to further investigate before arresting the plaintiff). Because the court finds that Defendants did have probable cause to arrest Plaintiffs and, therefore, that summary judgment is properly granted for Defendants as to this count, it need not address Plaintiffs' motion to amend their complaint to add Deputy Superintendent Harrison and Detective DiSantis to this count.

### D. Plaintiffs' Excessive Force Claim

Plaintiffs next claim that Officers Harrison and DiSantis used excessive force in placing

them under arrest and escorting them to the lockup area while Officers Lewandowski and Weiglein watched and failed to intervene. The Supreme Court has held that Section 1983 excessive force claims arising in the context of an arrest should be analyzed under the reasonableness standard of the Fourth Amendment. *Smith v. City of Chicago*, 242 F.3d 737, 743 (7th Cir. 2001)(*citing Graham v. Connor*, 490 U.S. 386, 395 (1989)). Under this objective standard, the officers' actions are considered "in light of the facts and circumstances confronting them" at the time, rather than "with the 20/20 vision of hindsight." *Connor*, 490 U.S. at 396-97. In conducting such a fact-specific analysis, courts are cognizant of the fact that police officers are often involved "in circumstances that are tense, uncertain, and rapidly evolving," during which time they are forced to make on-the-spot decisions about the amount of force necessary in any given situation. *See Graham*, 490 U.S. at 396-97. For this reason, the totality of the circumstances confronting the officers are considered in any excessive force analysis, taking into account such factors as "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the arrestee was] actively resisting arrest or attempting to evade arrest by flight." *Smith*, 242 F.3d at 743; *see also Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997)(*quoting Graham*, 490 U.S. at 396). Courts may also take into account the extent of the injuries a plaintiff has suffered and, while a finding of excessive force does not require any injury, the absence of injury gives weight to the assertion that excessive force was not employed. *See Meyer v. Robinson*, 992 F.2d 734, 738 (7th Cir. 1993)(citations omitted). Ultimately, the question for the court to determine is whether the officers' actions were objectively

reasonable in light of the circumstances without regard to the officers' intent or motivation. *See Estate of Phillips*, 123 F.3d at 592 (*citing Graham*, 490 U.S. at 397).

After considering Plaintiffs' excessive force claim under the totality of the circumstances involved, the court finds that Defendants are entitled to summary judgment as to this claim. The undisputed facts show that Plaintiffs had been at the police station for some time before their arrest. During that time Hadac and the Pogvaras were involved in such a loud argument that Deputy Superintendent Harrison became concerned that the yelling could escalate and become a "safety issue within the stationhouse." It was so bad that both groups had to be separated from one another in order to be interviewed.

Some time later, when Harrison walked over to the girls, told them they were under arrest and requested that they stand up, Hadac admits that she started screaming at the police officers, telling them they could not arrest Plaintiffs. Plaintiffs admit further that Hadac "told the girls not to stand up." (Pls.' 56.1 Response ¶ 18.) Mary A. also admits that once the officers grabbed her hands, she refused to cooperate with the officers and walk towards the lockup. Instead, she had to be pushed towards the lockup, which was only about 8 feet away, until she started walking of her own volition. Additionally, though Mary A. claims that it hurt when the officers pulled her hair (which was down to her waist) at the same time they grabbed her hands and Margaret M. alleges that when her hands were grabbed it felt like a long sting, it is undisputed that neither Plaintiff received any injury, scratch, or bruise of any

22

kind on their way to the lockup.[13]

Taking the circumstances in their totality, especially in light of Hadac's admission that she continued to yell at the police and tell them they could not arrest the girls, and Mary A.'s admission that she refused to cooperate with the police, this court cannot say that Defendants acted unreasonably in grabbing Plaintiffs by the wrists and pushing them towards the lockup, or even by grabbing Mary A.'s hair in the process. *See, e.g., Palmer v. Unified Government of Wyandotte County*, 72 F. Supp. 2d 1237, 1247 (D. Kan. 1999)(officer's pulling of an arrestee's hair does not rise to the level of a constitutional violation). The Supreme Court has held that police officers making an arrest or transporting a pretrial detainee may use some force in carrying out their duties. *Williams v. O'Banner*, No. 93 C 212, 1997 WL 264361, at *6 (N.D. Ill. 1997)(*citing Graham*, 490 U.S. at 396) (right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or theat thereof to effect it"). As the court has therefore explained, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.*[14]

---

[13]     Notably, the girls have not even identified which officer allegedly grabbed them. Though Hadac claims that when the girls stood up Harrison and DiSantis grabbed them, Margaret M. specifically said that she was not sure who grabbed her, and Mary A. did not identify any officer by name. Plaintiffs attempt to assert, in their Statement of Additional Facts, that Harrison grabbed Mary A. and DiSantis grabbed Margaret M., but they do not cite to the record to support this assertion, nor does it seem that they could, because both girls fail to identify who grabbed them in any of their testimony.

[14]     Additionally, even if Plaintiffs could establish that Defendants' behavior was improper, they are likely shielded by qualified immunity, especially in light of the fact that the girls were not cooperating completely with the officers. *See, e.g. Nelson v. City of*
(continued...)

Plaintiffs contend, however, that there was no reason for Defendants to touch them at all, and argue that this case is analogous to *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996), where the court found a material dispute of fact as to whether the officers involved used excessive force. In *Clash*, the Clash family's car was stopped by the police after their 12 year old son was seen holding what later turned out to be a cap gun. *Id.* at 1046. The defendant officer stopped the car, ordered Mr. Clash (the boy's father) to exit it, handcuffed him, and performed a patdown search which recovered no weapons. *Id.* The defendant then took Mr. Clash to a squad car and physically shoved him into the car, injuring Clash's knee in the process. *Id.* In determining that defendants were not entitled to qualified immunity, the district court originally found that the facts might show that the admitted shove was "wholly gratuitous," and, therefore, it could not be said that the shove was "reasonable as a matter of law." *Id.* at 1048.

The court cannot agree that the shove Plaintiffs received was similarly "wholly gratuitous." Though Plaintiffs were minors accused only of misdemeanor theft, they had not been wholly cooperative or calm before Defendants pushed them to the lockup. Indeed, Mary A. admitted that she was only pushed after she "refused to walk" so it cannot be said that pushing her towards the lockup room was wholly gratuitous. Nor can it be said that pushing Margaret to the lockup was wholly gratuitous in light of the fact that Mary Hadac

---

[14](...continued)
*Elmhurst*, 691 F. Supp. 122, 125 (N.D. Ill. 1988) (where plaintiff refused to obey arresting officer's instructions and then pulled his arm away from the officer after the officer grabbed it, officer was protected by qualified immunity after he tackled plaintiff to the ground).

was yelling at Defendants and saying that they could not arrest the girls at the same time Mary A. was refusing to walk. Instead, Defendants were merely doing what was necessary to complete the arrest. Additionally, unlike Mr. Clash, Plaintiffs were not handcuffed, and thus, were not as easily managed, so holding them by their wrists until they made it into the lockup was not inappropriate. Finally, unlike Clash, neither Plaintiffs suffered any injury as a result of either being pushed towards the lockup or grabbed by their hands. The court believes the evidence does not create a dispute of material fact regarding Plaintiffs' excessive force claim. At a minimum, Defendants are entitled to qualified immunity on this claim. *See Platek v. Village of Lisle*, No. 92 C 7479, 1994 WL 444787, at *12 (N.D. Ill. 1994)(finding that where police officers grabbed plaintiff's wrist, twisted his arm, pushed it behind his back and then pushed or prodded plaintiff to a spot before handcuffing him, defendants were entitled to qualified immunity especially in light of "the absence of any allegation that plaintiff suffered serious physical injury" from the officers' actions).

E.    **Unreasonable Search Claim**

Finally, Plaintiffs claim that they were subjected to an unreasonable "strip search" by Detective Rose Moore, as Officer Wirack and Deputy Superintendent Harrison watched and failed to intervene. Under the Fourth Amendment, in order for a search to be constitutional, it must be reasonable. *See, e.g. Veronia Sch. Dist. v. Acton*, 515 U.S. 646, 653 (1995). The Supreme court has explained that determining whether a search is reasonable

> requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification

for initiating it, and the place in which it is conducted.

*Kraushaar v. Flanigan*, 45 F.3d 1040, 1045 (7th Cir. 1995)(*quoting Bell v. Wolfish*, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884, 60 L. Ed.2d 447 (1979)). Generally, it is unreasonable to conduct a strip search for a minor infraction, such as a traffic violation, unless authorities have "reasonable suspicion that the arrestee is concealing weapons or contraband on his person." *Kraushaar*, 45 F.3d at 1045.

Defendants contend that the search was objectively reasonable. Defendants explain that Deputy Superintendent Harrison concluded that Plaintiffs "posed a safety risk to those present at the stationhouse" and, therefore, the search was appropriate once the Plaintiffs were taken into custody. Additionally, the search complied with Cicero police general order No.17, which states that, once a prisoner is placed in any holding cell "the first order of business is the search and inventory of property in his/her person." Defendants also contend that the search was done in private, by Officer Moore, a female officer, who only conducted a patdown search of the girls and never touched the skin of either Plaintiff. Additionally, Officer Moore stood behind the Plaintiffs as she did the search and did not attempt to do a visual inspection of them. Defendants also point out that it is undisputed that Moore never ordered the Plaintiffs to remove or adjust any of their clothing. Additionally, Mary A. herself admitted that her bra was exposed when she struggled with Moore and, even then, her bra was exposed for only a few seconds to a few minutes in length.

Plaintiffs paint a very different picture of the search to which they were subjected. They claim that they were subjected to an unreasonable strip search under the Cicero police

general order's very definition of strip search. According to Mary A., Officer Moore lifted Mary's shirt up to her bra and the officer put her hands on Mary's bra and her breast and "put her hand in [the bra] just to feel underneath and everything." She also claims that Officer Moore unbuttoned her pants, at which time her underwear "kind of showed." Margaret M. alleges that Moore searched her and "unbuckled my pants and put them down a little bit" exposing her underwear slightly.

Both Plaintiffs also claim that others were allowed to watch this search. According to Mary A., a male prisoner could see "the whole side of us" and was looking at her and saying "sick" things to them the entire time she was being searched. Margaret testified that she turned around and saw different officers looking through the window as the girls were being searched. Additionally, Hadac claims that when she walked to the door with Deputy Superintendent Harrison standing next to her, she was able to see Mary's bra and could also see that Mary and Margaret's pants were pulled down slightly.

Taking the facts in the light most favorable to the Plaintiffs, as the court must at this time, this court cannot say that a search that was not done in private and that involved some touching of skin and exposing undergarments was objectively reasonable for two minors charged with misdemeanor theft. The court recognizes, however, that Plaintiffs' version of the search are suspect for several reasons. To begin with, Mary A. and Margaret M. do not even agree with each other's accounts of the search. According to Mary A., she saw a male officer search Margaret M. and unbutton her pants, while Margaret M. claims that no such thing ever happened and, in fact, she was searched by Officer Moore right after Mary A.,

presumably a search Mary A. would have witnessed firsthand. Additionally, Defendants claim that no male prisoner was in the lockup that night and, further, it is impossible for other prisoners to see into the lockup area. Because Defendants provide no floor plans of the lockup or any proof beyond their own word, however, there remains a material dispute of fact that precludes summary judgment. Plaintiffs will, of course, have to defeat these glaring inconsistencies at trial. They will also have to show that their underclothes were deliberately exposed by Officer Moore and not merely inadvertently, when they struggled to get free of her reach. Taking the facts in the light most favorable to Plaintiffs, however, the court finds that summary judgment is not proper at this time. For this reason, Plaintiffs' motion to amend the complaint to add Officers Harrison and Wirack to this count for failing to intervene is granted.[15]

The court notes one final word of caution. Both Plaintiffs and Defendants make much of the Cicero police General Orders in order to prove their cases. For example, Plaintiffs claim that under the definition of a strip search provided by Cicero polices' own General Orders, Plaintiffs were improperly subjected to a strip search. Defendants, for their part, invoke their compliance with the General Orders as evidence that they did not violate

---

[15]    Though the court grants Plaintiffs' motion to amend their complaint to add Officer Wirack, Wirack can only be added on a theory of failing to intervene, not for searching the Plaintiffs. Though Mary A. claims that Wirack searched Margaret M., because Margaret alleges that he never touched her, and because any claim for unreasonable search would have to come from the Plaintiff who was allegedly searched by him (namely, Margaret and not Mary), the court finds that Officer Wirack did not himself perform an unreasonable search.

Plaintiffs' rights. In fact, however, Defendants' compliance (or noncompliance) with departmental rules will not control the outcome here. In order to state a section 1983 claim, Plaintiffs will have to do more than merely point out that Defendants' actions may have violated these local guidelines, they will, instead, have to show that Defendants' actions were proscribed by the Constitution. *See, e.g., Kraushaar v. Flanigan*, 45 F.3d 1040, 1049 (7th Cir. 1995)(finding that officer's failure to follow procedures that are required by state law, but not by the federal Constitution, establishes only a violation of state law); *see also Davis v. Scherer*, 468 U.S. 183, 194 (1984)("[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision").

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 43-1) is granted as to Counts I and II of Plaintiffs' Complaint and denied as to Count III. Plaintiffs' motion to strike (Doc. Nos. 45-1, -2, -3, 4, -5, -6) is denied in whole. Additionally, Plaintiffs' motion to amend their complaint (Doc. No. 44-1) to add Deputy Superintendent Bernard Harrison and James DiSantis to Count I is denied while Plaintiffs' motion to add Deputy Superintendent Bernard Harrison and Officer Walter Wirack to Count III in addition to

Officer Rose Moore is granted. Officers Mark Lewandowski, Matthew Weiglein and Detective James DiSantis are hereby dismissed from this case, while Officers Rose Moore and Walter Wirack, along with Deputy Superintendent Bernard Harrison remain as Defendants.

ENTER:

Dated: May 10, 2001

REBECCA R. PALLMEYER
United States District Judge